UMHOFER, MITCHELL & KING LLP
Elizabeth A. Mitchell (SBN 251139)
elizabeth@umklaw.com
767 S. Alameda St., Suite 270
Los Angeles, CA 90021
Telephone: 213-394-7979
Facsimile: 213-529-1027

WILLIAMS & CONNOLLY LLP
William T. Burke (*pro hac vice* forthcoming)
Grant A. Geyerman (*pro hac vice* forthcoming)
wburke@wc.com
ggeyerman@wc.com
680 Maine Ave, SW
Washington, DC 20024
Telephone: 202-434-5000
Facsimile: 202-434-5029

*Attorneys for Petitioner CVS Pharmacy, Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CVS PHARMACY, INC.,<br><br>                    Petitioner,<br><br>v.<br><br>OPTUMRX, INC.,<br><br>                    Respondent. | Case No. 2:23-mc-144<br><br>**LR 37-1 JOINT STIPULATION REGARDING PETITIONER'S MOTION TO COMPEL DOCUMENT PRODUCTION IN RESPONSE TO RULE 45 SUBPOENA**<br><br>**Date**:    TBD<br>**Time**:    TBD<br>**Crtrm**:   TBD<br>**Before**:  TBD |

# TABLE OF CONTENTS

<strong>PAGE</strong>

I.  INTRODUCTION .............................................................................................. 1

    A.  CVS's Introductory Statement ................................................................ 1

    B.  OptumRx's Introductory Statement ....................................................... 4

    C.  Local Rule 37-1 Prefiling Conference .................................................. 5

II. ARGUMENT ................................................................................................... 5

    A.  Legal Standard...................................................................................... 5

    B.  Document Requests in Dispute ............................................................. 6

    C.  CVS's Position ..................................................................................... 8

        1.  OptumRx's Commercial Contracts Are Relevant to CVS's Defenses. .......................................................................................... 8

        2.  OptumRx's Communications with Commercial Health Plans Are Relevant to the Issues of Reliance and Causation. .......................... 9

        3.  OptumRx's GER Reconciliation Data Are Relevant to Injury and Damages................................................................................... 11

        4.  The Subpoena Is Proportionate and Does not Impose an Undue Burden on OptumRx. ....................................................................... 12

    D.  OptumRx's Position ........................................................................... 14

        1.  Many of OptumRx's Client Contracts Are Not with Potential Classmembers, and Are Therefore Irrelevant............................... 14

        2.  Producing All of its Client Contracts Would Impose an Undue Burden on OptumRx. ....................................................................... 16

        3.  OptumRx Does Not Possess Information Responsive to Request No. 6.............................................................................................. 18

        4.  The Communications Sought by CVS are Duplicative and of Minimal Relevance. ........................................................................ 18

        5.  Alternatively, Petitioners should be required to pay the costs associated with this burdensome contract review........................... 20

# TABLE OF AUTHORITIES

**CASE  PAGE(S)**

*Anza v. Ideal Steel Supply Corp.*,
 547 U.S. 451 (2006)................................................................................10

*Ayers v. Lee*,
 2017 WL 2472840 (S.D. Cal. June 8, 2017) .......................................5

*Bridge v. Phx. Bond & Indem. Co.*,
 553 U.S. 639 (2008)................................................................................10

*Concord Boat Corp. v. Brunswick Corp.*,
 169 F.R.D. 44 (S.D.N.Y. 1996)............................................................15

*Emp'r Teamsters- Local Nos. 175/505 Health & Welfare Tr. Fund v. Bristol Myers Squibb Co.*,
 969 F. Supp. 2d 463 (S.D. W. Va. 2013).............................................10

*Exxon Shipping Co. v. U.S. Dep't of Interior*,
 34 F.3d 774 (9th Cir. 1994) ....................................................................6

*Gonzalez v. Proctor & Gamble Co.*,
 247 F.R.D. 616 (S.D. Cal. 2007)..........................................................10

*HI. Q, Inc. v. ZeetoGroup, LLC*,
 2022 WL 17345784 (S.D. Cal. Nov. 29, 2022)...................................13

*In re Light Cigarettes Mktg. Sales Practices Litig.*,
 271 F.R.D. 402 (D. Me. 2010)..............................................................10

*In re Niaspan Antitrust Litig.*,
 67 F.4th 118 (3d Cir. 2023)...................................................................15

*Legal Voice v. Stormans Inc.*,
 738 F.3d 1178 (9th Cir. 2013)...............................................................19

*Markarian v. Conn. Mut. Life Ins.*,
 202 F.R.D. 60 (D. Mass. 2001).............................................................10

*Mattel, Inc. v. Walking Mountain Productions*,
 353 F.3d 792 (9th Cir. 2003).................................................................15

*Moon v. SCP Pool Corp.*,
 232 F.R.D. 633 (C.D. Cal. 2005).............................................................6

*Sanchez v. Am. Media, Inc.*,
 No. CV 20-2924 DMG (PVCx),
 2023 U.S. Dist. LEXIS 128266 (C.D. Cal. May 8, 2023) .................15

*In re Trinh*,
 No. 2:18-bk-11475-RK,
 2022 Bankr. LEXIS 1517 (Bankr. C.D. Cal. May 31, 2022) .............15

*Washington v. CVS Pharmacy, Inc.*,
  2022 WL 17430289 (9th Cir. Dec. 6, 2022) ................................................ 2

**STATUTES**

Ca. Bus. & Prof. Code § 17204 ................................................................. 10

**RULES**

Federal Rules of Civil Procedure 26(b)(1) ............................................. 5, 12

Federal Rules of Civil Procedure 30(b)(6) ................................................. 4

Federal Rules of Civil Procedure 45(a)(1)(D) ........................................... 6

Federal Rules of Civil Procedure 45(d)(1) ............................................... 12

JOINT STIPULATION REGARDING PETITIONER'S MOTION TO COMPEL DOCUMENT PRODUCTION

Pursuant to Local Rule 37-2, Petitioner CVS Pharmacy, Inc. ("CVS") and Respondent OptumRx., Inc. ("OptumRx"), state as follows:

## I.    INTRODUCTION

### A.    CVS's Introductory Statement

CVS Pharmacy, Inc. ("CVS") moves to compel compliance with a subpoena duces tecum it served on OptumRx in connection with a certified class action pending against CVS in the United States District Court for the District of Rhode Island. *See Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, No. 1:16-cv-00046-S (D.R.I), and *Plumbers Welfare Fund, Local 130, U.A. v. CVS Pharmacy, Inc.*, No. 1:16-cv-00447-S (D.R.I) ("Sheet Metal").

***The Sheet Metal Litigation.***  In 2016, a group of health plans filed two, nearly identical and now-consolidated class actions against CVS and CaremarkPCS Health, LLC ("Caremark").  Plaintiffs allege that, between November 2008 and February 2016, CVS and five pharmacy benefit managers ("PBMs")—including named-Defendant Caremark and non-party OptumRx—engaged in a scheme and conspiracy to overcharge health plans around the country whenever the health plans' members purchased certain generic prescription drugs at CVS pharmacies.  Plaintiffs allege violations of the federal civil RICO statute and state-law consumer protection statutes, and seek more than $1 billion dollars in damages.

Plaintiffs' allegations of overcharging focus on CVS's membership program called Health Savings Pass ("HSP"), which offered reduced prices on certain generic drugs to customers who enrolled, paid an annual membership fee, and agreed to the program's terms and conditions.  According to Plaintiffs, CVS should have treated its HSP prices as its Usual and Customary ("U&C") prices when reporting U&C prices to Caremark and other PBMs.  If CVS had done so, the argument goes, the contracts between the PBMs and the health plans would have required the PBMs to pass along the reduced HSP prices to the health plans, regardless of whether the health plans' beneficiaries had enrolled in HSP, paid its annual fee, and agreed to its other terms.

And, according to Plaintiffs, the PBMs conspired with CVS to conceal from the health plans that CVS was not treating its HSP prices as U&C prices.  Defendants reject these allegations.[1]  Consistent with industry practice and its contracts, CVS has always submitted its retail cash price—the price available to customers who lack insurance coverage, HSP membership, or a discount card—as its U&C price.  U&C prices at CVS did not include the prices available to members of CVS's HSP program or prices charged to customers using discount cards or insurance, which are set by contract between CVS and a third-party entity.

**Class Certification Order.**  The *Sheet Metal* court granted class certification on May 11, 2021.  Defendants had argued in opposition that certification was improper for several reasons.  Relevant here, Defendants maintained that a class action was not the appropriate mechanism to litigate Plaintiffs' claims, in part because prescription drug pricing is a highly complex issue defined by multiple layers of individually negotiated contracts that vary widely by client.  As part its order granting certification, the *Sheet Metal* court nevertheless acknowledged—relevant to this Motion—that "contract review" of the agreements between the PBMs and their health plan clients "appears inescapable."  Geyerman Decl., Ex. D (Class Cert. Order 46, *Sheet Metal*, No. 16-cv-00046 (D.R.I. May 11, 2021), ECF No. 180); *see also id.* at 45 ("[T]he contract language will make a difference.").  This is because, based on the PBMs' contracts with their health plans, some health plans "have no colorable claim to be entitled to lower-of U&C pricing," and of those that are so entitled, some of those health plans "may or may not have been entitled to receive the HSP price as its U&C price."  *Id.* at 46.  The *Sheet Metal* court contemplated, moreover, that Plaintiffs would thus seek contracts and PBM data through "document subpoenas to the third-party PBMs" in order to identify which health plans paid for HSP drugs based on a formula

---

[1] Similar allegations that HSP prices should have been reported as U&C prices have previously been rejected by a jury in federal court, and that verdict was affirmed on appeal. *See Washington v. CVS Pharmacy, Inc.*, 2022 WL 17430289 (9th Cir. Dec. 6, 2022); *see also Humana Health Plan, Inc. v. CVS Pharmacy, Inc.* No. 01-19-0000-6924 (Am. Arbitration Ass'n, May 24, 2022) (denying and dismissing with prejudice Humana's similar allegations in a binding arbitration).

incorporating lower-of U&C pricing. *Id.* at 38.  After the contracts have been reviewed, the *Sheet Metal* court envisions the parties "sort[ing] into various buckets [the relevant contractual language] and litigat[ing] group by group" in subclasses. *Id.* at 46.  And on the issue of individual class member knowledge, the *Sheet Metal* court also concluded that individual knowledge issues did not defeat class certification, noting that it is "prepared to manage any such knowledge issues with subclasses." *Id.* at 32, 44.  In light of these rulings, Defendant Caremark, a PBM, has already produced to Plaintiffs its relevant contracts with commercial clients.

*CVS's Subpoena to OptumRx.*  On March 1, 2022, CVS served OptumRx with a subpoena seeking twelve categories of documents that are relevant to CVS's defenses.  *See* Geyerman Decl., Ex. A (Subpoena).[2]  Over the course of multiple discussions with OptumRx during the last the year and a half, CVS narrowed the focus of its subpoena to four out of the twelve requests.  Geyerman Decl. ¶¶ 7-8.  CVS has further winnowed down the focus on this motion to compel to only three requests: Subpoena Requests Nos. 6, 7 and 12.  Geyerman Decl. ¶ 11.  These requests seek data and documents responsive to requests for certain of OptumRx's commercial contracts, reconciliation data, and communications with its clients. CVS does *not* seek to compel enforcement of the remaining requests.

OptumRx does not contest that relevant, responsive documents exist concerning at least two of these categories of documents, but refuses to comply with the subpoena by producing those documents.  Instead, OptumRx claims that the production of the documents would be unduly burdensome.  Geyerman Decl. ¶ 8.  During the meet-and-confer process, CVS's counsel explained the relevance of the documents requested and underscored CVS's need for such documents, particularly in light of the *Sheet Metal* court's class certification order.  Geyerman Decl. ¶ 7.  To date, the parties have been

---

[2] On June 10, 2021, Plaintiffs served a nearly identical subpoena on OptumRx. Plaintiffs also have filed a motion to compel OptumRx to produce documents responsive to that subpoena in this Court.  A hearing is scheduled on October 17, 2023 before Magistrate Judge Alicia Rosenberg.  Scheduling Notice, *Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. OptrumRX, [sic] Inc.*, No. 23-mc-12 (C.D. Cal. Sept. 25, 2023), ECF No. 10.

1  unable to resolve their disagreement and OptumRx has not produced the documents

2  sought by CVS's subpoena.  CVS's motion to compel should be granted.

3  **B.    OptumRx's Introductory Statement**

4  CVS omits several facts critical to the Court's consideration of the substantial

5  burden that responding to CVS's latest subpoena—even as narrowed—would impose

6  upon OptumRx, as well as the relevance, proportionality, and duplicate nature of the

7  documents sought by CVS.

8  *First,* OptumRx has received four subpoenas in *Sheet Metal*, two each from the

9  Plaintiffs and CVS.  Montcalm Decl. ¶ 2.  Prior to the class certification order, CVS

10  issued its first subpoena, which sought the same type of documents and information

11  sought here, and also identified twelve topics for a corporate deposition by OptumRx.

12  *See id.* Ex. 1.  In response to, and in compliance with, CVS's first subpoena, OptumRx

13  designated two witnesses to cover the twelve topics identified by CVS under Fed. R.

14  Civ. P. 30(b)(6).  *Id.* ¶ 3.  Those witnesses were deposed on February 26, 2019, during

15  which CVS had a full and fair opportunity to seek testimony about those designated

16  topics, which overlap with the documents sought on this motion.  *Id.* ¶ 3, Ex. 1.

17  *Second*, for the majority of the relevant time period, OptumRx and its

18  predecessor entities constituted a very small percentage of the overall PBM market.

19  UnitedHealth Group Inc. ("UHG") acquired PacifiCare Health Systems, Inc. in

20  December 2005.  *See* Montcalm Decl. ¶ 4.  PacifiCare offered PBM services through

21  its subsidiary, Prescription Solutions which, in the year following that acquisition, held

22  about three percent market share for offering PBM services.  *See id.* ¶¶ 4-5.  On April

23  11, 2011 UHG announced the unification of its health services businesses under the

24  brand name Optum, and rebranded Prescription Solutions as OptumRx.

25  In 2012, the three largest PBMs (Express Scripts, Caremark and Medco) had a

26  combined market share of 73%.  *Id.* ¶ 7.  The then-fourth largest PBM, Aetna, had a

27  market share that was well below 10%.  *Id.*  At this time, OptumRx's share of the

28  market for commercial PBM business was still "infinitesimal."  *Id.* ¶ 8.  One FTC

Commissioner stated that OptumRx was "an ant to an elephant compared to the soon-to-be Bit Two PBMs." *See id.* OptumRx did not begin to achieve market share above the "infinitesimal" level until 2013, when it started providing PBM services to UnitedHealthcare, the health benefits business of UHG. *See id.* ¶ 9.[3] OptumRx then grew more substantial marketshare in 2015—after the end of the relevant time period for this case—when it combined with Catamaran. *See id.* ¶ 11.[4]

*Third*, regarding its client contracts, OptumRx has offered two independent compromises with CVS (and Plaintiffs), both of which were rejected. OptumRx first offered for the parties to negotiate and agree upon a reasonable and representative sample of OptumRx's contracts to be produced, rather than OptumRx producing every single client contract in effect for a period of over seven years. *See id.* ¶ 12. CVS (and Plaintiffs) both rejected this offer, claiming instead that it needs every single contract. *See* Geyerman Decl. Ex. C OptumRx next offered to produce all of the contracts, in redacted form, if CVS or Plaintiffs (or both) would pay the costs associated with the retrieval, review and redaction of those contracts. *Id.* ¶ 13. CVS (and Plaintiffs) also rejected this offer. *Id*.

## C. Local Rule 37-1 Prefiling Conference

Counsel for CVS and OptumRx have met-and-conferred on several occasions over the last year-and-a-half regarding the subpoena and are at an impasse. *See generally* Geyerman Decl.

## II. ARGUMENT

### A. Legal Standard

Federal Rules of Civil Procedure 26 and 45 "govern discovery from nonparties by subpoena." *Ayers v. Lee*, 2017 WL 2472840, at *2 (S.D. Cal. June 8, 2017) (citing

[3] Prior to January 1, 2013, UHC had been Medco's largest client for PBM services. *See id.* ¶ 10.

[4] Although Petitioner's subpoena defines the end of the "relevant time period" as February 1, 2016, the court in *Sheet Metal* excluded from the certified class any health plans making payments processed by OptumRx after January 29, 2015. Class Cert. Order 22. Therefore, the relevant time period for OptumRx should end on January 29, 2015, not February 1, 2016.

*Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994)).  Under

Federal Rule of Civil Procedure 45, a party may serve a subpoena commanding a third

party produce documents relevant to the lawsuit.  *See* Fed. R. Civ. P. 45(a)(1)(D);

*Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005).  The enforcement of

Rule 45 generally turns on several factors: courts "weigh the burden to the subpoenaed

party against the value of the information to the serving party," and consider "such

factors as relevance, the need of the party for the documents, the breadth of the

document request, the time period covered by it, the particularity with which the

documents are described, and the burden imposed."  *Moon*, 232 F.R.D. at 637.

## B.     Document Requests in Dispute

CVS moves to compel OptumRx to produce documents in response to three

requests from CVS's subpoena, which are set forth below along with Optum Rx's

formal written objections.

### Request No. 6:

Electronic data, documents, and computer code for each Covered Plan[5]
during the relevant period regarding summaries for each period of GER[6]
true-up.  This data should be relatable to the CVS claims data for each claim
in the CVS data.[7]

---

[5] "Covered Plan" is defined as:

[A]ll health plans, otherwise known as third party payors or insurers,
with which you contracted during the relevant time period, excluding (1)
any governmental payors, including Medicare and Medicaid; (2) any health
plans that served on Caremark's Client Advisory Committee since June 1,
2008; (3) any health plans that have had parent, subsidiary, or affiliate
relationships with any pharmacy benefit manager at any time since January
1, 2008; and (4) health plans making payments processed by OptumRx after
January 29, 2015.

[6] "GER" means Generic Effective Rate Guarantees.

[7] The request continues:

This should include, but not be limited to: (a) the relevant plan; (b)
the relevant period; (c) the GER calculation(s) during the relevant period
including: (i) GER Type if multiple GER calculations occurred (e.g., Retail,
Mail Order, Retail 90-Day Supply Chains, etc.); (ii) the number of claims
included in the GER calculation; (iii) the total ingredient cost of all generic
claims included in GER calculations, excluding dispensing fees; (iv) the
total applicable AWP for all generic claims included in GER calculations,

**OptumRx's Response to Request No. 6:**

OptumRx incorporates the General Objections and further incorporates its objections and responses to Request No. 5. OptumRx further objects to this Request as vague and ambiguous, including the use of multiple capitalized terms that are not otherwise defined in the Subpoena.

**Request No. 7:**

All contracts for each Covered Plan that paid for generic pharmaceutical products based on formulas that included Usual & Customary Price (U&C) during the relevant time period.

**OptumRx's Response to Request No. 7:**

OptumRx incorporates the General Objections and further objects to this Request as overly broad, unduly burdensome and disproportionate to the needs of the Action.  Responding to this Request would first require OptumRx to identify all of the Covered Plans, as requested in Request No. 1.  OptumRx therefore incorporates by reference its responses and objections to Request No. 1.  Even if OptumRx could identify the hundreds or thousands of Covered Plans responsive to Request No. 1, OptumRx further objects to this Request as overly broad, unduly burdensome and disproportionate to the needs of the Action.  To identify the requested contracts, OptumRx would have to review thousands of client contracts to determine whether they include pricing structures that incorporate U&C.  The effort and cost associated with such a review would be entirely unreasonable.  Moreover, before OptumRx could produce those contracts—and even if OptumRx were to produce the contracts to Defendants for their review of the pricing structures—OptumRx would have to provide written notice to such clients and obtain written permission from many of the clients pursuant to the disclosure and confidentiality obligations typically found in its contracts.  OptumRx further objects to this Request because producing the requested contracts also would require OptumRx to disclose highly confidential and commercially sensitive information which would cause OptumRx competitive harm that far outweighs any benefits in this Action or that is proper given OptumRx's status as a nonparty.  OptumRx further objects to this Request to the extent it calls for documents, the production of which would cause OptumRx to violate confidentiality obligations to third parties.

**Request No. 12:**

All communications with Your clients regarding Membership Programs from the period January 1, 2007 through January 31, 2016.[8]

---

excluding dispensing fees; (v) total amount of dispensing fees paid; (vi) Actual Discount Rate calculated for GER calculation; (vii) Target Discount Rate for GER calculation; (vii) Performance Difference of Actual vs Targeted rate.

[8] "Your" refers to:

JOINT STIPULATION REGARDING PETITIONER'S MOTION TO COMPEL DOCUMENT PRODUCTION

**OptumRx's Response to Request No. 12:**

OptumRx incorporates the General Objections and further objects to this Request as overly broad, unduly burdensome and disproportionate to the needs of the Action, and seeks irrelevant documents. Responding to this Request would require OptumRx to search all communications it has had with all of its clients for a period of over nine years beginning over 15 years ago. OptumRx further objects to this Request as entirely duplicative o[f] Request No. 2 in the Previous Subpoena, which was served during fac[t] discovery over 3.5 years ago, and specifically incorporates herein its objections [to] that Request, which stated, in part: "OptumRx further objects to this Request to the extent it seeks the production from a competitor of highly-confidential, proprietary, commercially sensitive, and/or trade secret documents and information that are neither relevant to the claims and defenses in this Action, nor subject to adequate protection by the operative protective order in the Action. OptumRx further objects to this Request to the extent it seeks documents that are protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege or doctrine. Subject to and without waiver of the foregoing objections, OptumRx responds that it will meet and confer with Defendants in good faith to discuss whether this Request can be narrowed to address the issues of relevance, burden, and competitive harm, among others, contained therein.

**C.    CVS's Position**

CVS easily meets the threshold showing of relevance for its three requests.

**1.    OptumRx's Commercial Contracts Are Relevant to CVS's Defenses.**

During the meet and confer process, CVS explained that the only way to satisfy Request No. 7 is for OptumRx to produce its contracts with commercial health plans that were in effect at any point from November 1, 2008 until January 31, 2016, as Caremark itself has already done.  OptumRx did not agree to produce its contracts. Geyerman Decl. ¶ 13.

---

Optum Rx, Inc. and its predecessors, including all divisions, subdivisions, and units; corporate affiliates; and to all persons acting or purporting to act on Optum Rx's behalf, including employees, supervisors, managers, executives, board members, officers, directors, agents, and contractors.
"Membership Program" means:
[A] pharmacy's offering of an enumerated list of generic prescription medications for a standard or fixed price for which the pharmacy requires customers to register or join a program or plan in order to access the special pricing.  Examples include, but are not limited to, Walgreens' Prescription Savings Club and CVS's Health Savings Pass.

OptumRx's contracts with health plans in the class are necessary for CVS to defend against Plaintiffs' claims on several fronts, which the *Sheet Metal* court has already acknowledged. In its class certification order, the *Sheet Metal* court explained that "contract review … appears inescapable" to understand the meaning of "usual and customary" as defined in the contract for a given class member. Class Cert. Order 46. Moreover, the *Sheet Metal* court contemplated that one must "review all PBM contracts for a range of annual [generic effective rate, or] GER guarantees and identify each PBM's highest GER guarantee for each year" to calculate damages offsets. *See id.* 45-46, 66. The contracts CVS seeks from OptumRx identify class members, specify whether OptumRx's client was entitled to receive U&C prices, and provide the definition of "usual and customary" price, and include the relevant GER information. *See id.* The contracts also contain many other terms that outline the PBM-to-health plan relationship (e.g., alternative-dispute-resolution clauses, choice-of-law clauses, limitations-of-liability provisions, etc.) that pertain to CVS's defenses. Given the *Sheet Metal* court's conclusion that the contracts are plainly relevant to a number of issues in the litigation, the contracts easily clear the relevance bar.

## 2.    OptumRx's Communications with Commercial Health Plans Are Relevant to the Issues of Reliance and Causation.

During the meet and confer process, CVS proposed that OptumRx satisfy Request No. 12 by providing its communications with all commercial health plans concerning (a) the Health Savings Pass program and (b) similar membership programs offered by other pharmacies. Specifically, CVS requested that OptumRx search the emails of account managers working on the company's commercial health plan accounts from November 2008 through January 2016 using seven specific search terms.[9] OptumRx did not agree to this proposal. Geyerman Decl. ¶ 13.

---

[9] The specific search terms include: (1) "Health Savings Pass," (2) "HSP," (3) "generic* program*," (4) "membership program*," (5) "discount program*," (6) "Change to win," and (7) "Walmart" w/10 "$4."

- 9 -

OptumRx's communications with its clients concerning CVS's HSP program and similar membership programs offered by other pharmacies (e.g., Walgreens, Rite Aid) are relevant because they undermine the elements of reliance and causation that Plaintiffs must prove for each of their fraud-based claims. The communications will show that many class members had actual or constructive knowledge that pharmacies—including CVS and other pharmacies operating similar membership programs—were not submitting HSP prices or similar membership program prices as U&C prices.

Knowledge is a case-dispositive defense. Class members who had such knowledge cannot satisfy the causation and reliance elements of their RICO or state-law consumer-protection claims or prove that any enrichment flowing from CVS's non-submission of HSP prices as U&C was "unjust." For example, civil RICO claims are subject to a stringent causation standard. The "central question" is "whether the alleged violation led directly to the plaintiff's injuries," *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006), and "the complete absence of reliance may prevent the plaintiff from establishing proximate cause." *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 658-59 (2008). It follows from RICO's strict causation standard that an alleged RICO violation does not lead "directly" to Plaintiffs' alleged overpayment if the Plaintiffs made that payment with eyes wide open to the challenged pricing practice. *Anza*, 547 U.S. at 461. Similarly, the state consumer protection statutes

covered by Plaintiffs' classes require proof of causation, reliance, or both.[10]  The same is true for several of Plaintiffs' state-law unjust enrichment claims.[11]

Thus, for both the civil RICO and state-law claims, communications between OptumRx and its clients are relevant to show that if the health plan knew it was not receiving HSP prices as U&C prices and paid the allegedly inflated prices anyway, then the direct cause of the alleged overpayment was *not* CVS's allegedly "fraudulent" price report, but instead the health plan's agreement with the price that CVS charged.

### 3.    OptumRx's GER Reconciliation Data Are Relevant to Injury and Damages.

During the meet and confer process, CVS proposed that OptumRx could satisfy Request No. 6 by providing reconciliation reports for all commercial health plans for November 1, 2008 until January 31, 2016, or other documents sufficient to show the reconciliation payments made (amounts, dates, and health plan).  OptumRx did not agree to produce its reconciliation reports and instead maintained that it did not have documents responsive to this request.  Geyerman Decl. ¶¶ 8, 14.

A generic effective rate or "GER," is a contractual guarantee that a health plan will not pay more than a specified average price for a group of generic drugs during a

---

[10] *See, e.g.*, *Markarian v. Conn. Mut. Life Ins.*, 202 F.R.D. 60, 68 (D. Mass. 2001) ("[P]roof of actual reliance on a misrepresentation is not required so long as the evidence warrants a finding of a causal relationship between the misrepresentation and the injury to the plaintiff." (internal quotation marks omitted)); *see also Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 624 (S.D. Cal. 2007) ("Plaintiff, relying on *Vasquez*, argues that CLRA claims are subject to class wide proof of liability and reliance without a need for individualized proof. As previously discussed, however, *Vasquez* and its progeny only permit an inference of common reliance when the allegations demonstrate that a single, material misrepresentation was directly made to each class member."); Ca. Bus. & Prof. Code § 17204 (Actions shall be prosecuted "by a person who has suffered injury… *as a result* of the unfair competition." (emphasis added)).

[11] *See, e.g.*, *In re Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. 402, 408 (D. Me. 2010) ("The Plaintiffs recognize that causes of action under California CLRA, Illinois ICFA, and Illinois unjust enrichment require damage and reliance."); *see also Emp'r Teamsters- Local Nos. 175/505 Health & Welfare Tr. Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 475 (S.D. W. Va. 2013) ("Without any specific allegations as to who received these misrepresentations, how the misrepresentations influenced doctors, and why certain patients received Plavix instead of alternative medications, this Court is left without sufficient allegations from which to properly infer that proximate causation is satisfied. Therefore, both of Plaintiffs' claims [including for unjust enrichment] should be dismissed for lack of causation.").

given year.  At the end of the year, if a health plan paid more for a group of generic drugs than the GER—the guaranteed average price specified in the health plan's contract with OptumRx—then OptumRx was required to make a "reconciliation payment" to the health plan that reduced the average price to the GER.  Thus, data regarding the reconciliation payments by OptumRx to its health-plan clients is relevant to show that any allegedly "inflated" payments for generic drug purchases at CVS were reduced, or in some cases even zeroed out, to achieve the negotiated GER.  Class Cert. Order 60-61, 64-65.  Such reconciliation reports are therefore critical evidence regarding the existence of injury and/or damages allegedly suffered by health plans in the class.

### 4. The Subpoena Is Proportionate and Does not Impose an Undue Burden on OptumRx.

CVS is facing claims for more than $1 billion dollars by a nationwide class of Plaintiffs that includes commercial health plans who are clients of OptumRx.  OptumRx's contracts and reconciliation data with each of those health plans, which set forth their rights and obligations, are thus unquestionably proportionate discovery to CVS's needs in the case.  *See* Fed. R. Civ. P. 26(b)(1).  So, too, are the communications between OptumRx and its clients that pertain to their knowledge that they were not receiving HSP prices.  CVS has also taken, to the extent practicable, "reasonable steps to avoid imposing undue burden or expense" on OptumRx, and has sought the discovery in the most efficient and least burdensome manner.  Fed. R. Civ. P. 45(d)(1).  CVS, for example, has significantly limited the scope of the subpoena requests, and has offered a discrete set of search terms applicable to the communications request.  The Court should find that the importance of the information to the underlying litigation outweighs any such burden imposed on OptumRx.

For all of these reasons, the relevance and importance of the documents sought are critical to CVS's ability to defend itself against Plaintiffs' billion-dollar claims.  CVS acknowledges that compliance with its request for the production of commercial

contracts will likely involve a time-intensive process to identify the relevant contracts, but the *Sheet Metal* court's class certification order leaves the parties no choice:  the order requires that these contracts be produced for individualized review in analyzing the merits of the parties' claims and defenses.  Class Cert. Order 46.  They are paramount to, for example, Plaintiffs' ability to identify the class members and CVS's ability advance defenses such as the contractual meaning of U&C price, lack of injury, statute of limitations (e.g., choice of law provisions), mandatory arbitration, and limitations on liability.  And, as the district court in the underlying litigation already noted, reviewing the classes' contracts is "inescapable."  *Id.* at 46.

CVS cannot reasonably seek these documents from anyone other than OptumRx.  The relevant contracts, data, and communications are in OptumRx's possession, not in CVS's.  CVS therefore had no choice but to serve a subpoena on OptumRx, because these documents are "uniquely within OptumRx's control" and are "kept in the ordinary course of business by [OptumRx]" and no other entity.  *HI. Q, Inc. v. ZeetoGroup, LLC*, 2022 WL 17345784, at *14 (S.D. Cal. Nov. 29, 2022).  Although some health plans may possess relevant contracts or communications, CVS does not know the identity of those health plans.  And they are decentralized, whereas OptumRx is the centralized source of these materials.  In other words, CVS cannot reasonably and efficiently obtain these documents from another source.  Finally, CVS has taken steps to minimize the burden on OptumRx by narrowing its document requests from twelve categories of information down to the three requests which are the subject of this Motion.  Geyerman Decl. ¶ 11.

Finally, to the extent that any concern arises that OptumRx would have to produce contracts and other documents to one of its principal PBM competitors—CVS's co-defendant, CaremarkPCS Health, LLC—there are procedures in place to alleviate any such concern.  First, OptumRx may redact irrelevant contract provisions,

producing only those aspects that are relevant to the *Sheet Metal* litigation.[12]  Second, the *Sheet Metal* court has anticipated such concerns by issuing a protective order that allows third parties such as OptumRx to designate documents containing highly sensitive commercial information as "Highly Confidential – Attorneys' Eyes Only." *See* Geyerman Decl., Ex. E (Stipulated Amended Protective Order, sec. IX).  This provision of the protective order prohibits anyone at Caremark (or CVS), except for two specifically designated in-house counsel (who are litigators and do not advise on business strategy), from reviewing the designated information.  No Caremark personnel involved in direct business competition with OptumRx is able to review or utilize any information produced by OptumRx and designated "Highly Confidential – Attorneys' Eyes Only."

CVS respectfully requests that the Court grant CVS's Motion to Compel and order OptumRx to produce, pursuant to Request Numbers 6, 7 and 12 in the subpoena: (1) all contracts with any commercial health plan in effect from November 1, 2008 through January 31, 2016; (2) the reconciliation reports for all commercial health plans from November 1, 2008 through January 31, 2016, or other documents sufficient to show the reconciliation payments made (i.e., amounts, dates, and health plan); and (3) communications between OptumRx and commercial health plans concerning (a) CVS's Health Savings Pass program and (b) similar membership programs offered by other pharmacies.  CVS respectfully requests that the Court order OptumRx to produce these materials within 90 days of granting the Motion.

### D.   OptumRx's Position

**1.   1.   Many of OptumRx's Client Contracts Are Not with Potential Classmembers, and Are Therefore Irrelevant.**

The class certification order in *Sheet Metal* was based on the competing proposals of the litigants, with no input from OptumRx or any other non-party PBM.

---

[12] Defendant Caremark produced only redacted copies of its contracts with the class health plans.  Before it did so, the parties agreed upon which portions of the contract would be redacted.

*See* Class Cert. Order at 37-40.   The portions of the opinion upon which CVS relies all discuss contracts between PBMs and "TPPs" (which the court defined as "third-party payors"), or putative classmembers, all of whom would be TPPs.  *See id.* at 2, 37-47. CVS argues that all of OptumRx's client contracts sought in the subpoena will identify class members, and also contain other information relevant to Petitioner's defenses. This is not accurate.

As the Third Circuit recently discussed in detail in a similar context, while TPPs may contract directly with PBMs, many TPPs contract with third-party administrators ("TPAs") – which are not end-payors or TPPs – who contract and interact with the PBM on behalf of the TPP.[13]  In explaining the prescription drug market, the Third Circuit noted that:

> While health plan sponsors may contract directly with a PBM to administer their prescription drug benefits, there are plan sponsors that elect to contract with yet another intermediary, called a third-party administrator ('TPA'), to work on their behalf with PBMs.  A TPA helps the sponsor manage their group plan benefits and assists with the claims adjudication and reimbursement process.  A TPA may be an insurance company or a company dedicated to providing only TPA services.  When an insurer provides TPA services to another entity but does not provide a fully insured health plan, it is said to be providing an administrative-services-only plan and is called an 'ASO' in that relationship.  A TPA is never an end-payor because, even though it initially pays for the plan beneficiaries' prescriptions, it is later reimbursed.  When a sponsor elects to contract with a TPA, the PBM has no relationship with the end-payor.[14]

That is the case here.  *See* Liou Decl. ¶ 13.[15]  Any contract that OptumRx has with a TPA, as opposed to a TPP, will not be with a potential classmember, and any potential additional contract terms between OptumRx and a TPA (including GER terms, dispute resolution procedures, or U&C definitions), would not be between

[13] *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 123 (3d Cir. 2023).

[14] *Id.*  The Third Circuit used "end-payor" and "TPP" interchangeably.  *Id.* at 126 n.3.

[15] OptumRx submitted the Declaration of David Liou in opposition to the motion to compel brought by the Plaintiffs.  *See Sheet Metal Workers Local No. 20 Welfare & Benefit Fund, et al. v. Optrum RX, Inc.* Case No. 8:23-mc-00012-DOC-AGR, ECF 1-2.  This declaration is being resubmitted here because it addresses issues relevant to CVS's motion to compel and the associated burdens of compliance therewith on OptumRx.

JOINT STIPULATION REGARDING PETITIONER'S MOTION TO COMPEL DOCUMENT PRODUCTION

OptumRx and that putative classmember.  Courts regularly quash, or otherwise decline to compel production of documents in connection with, subpoenas that seek information that is not relevant to the facts at issue, and that is the appropriate result here where the production of the requested documents would not answer the question at issue.[16]

### 2.     Producing All of its Client Contracts Would Impose an Undue Burden on OptumRx.

Though *Sheet Metal* involves potentially substantial damages, that is not enough by itself to justify the burden that would be imposed upon OptumRx in producing all of its client contracts during the relevant time period.

OptumRx stores its clients' contracts in a database in a digitized format, typically as a .pdf file.  Liou Decl. ¶ 5.  While the text of individual contracts – which often exceed 100 pages and include multiple amendments – is searchable, there is no mechanism to query a specific range of terms across an aggregated set of contract documents.  *Id.* ¶¶ 5-7.  Similarly, extrapolating text from client contracts requires a manual cut and paste by the reviewer.  *Id.* ¶6.  As a result, OptumRx's employees must manually search for and retrieve the contracts and manually analyze the relevant terms to determine whether the contract is responsive to CVS's requests.  *Id.* ¶ 7.  Because financial terms vary across contracts, the employee conducting searches within the document would need to have an idea of whether and where the terms appear to efficiently locate the relevant information.  *Id.*  OptumRx estimates that it possesses as many as 2,000 contracts for 1,200 clients responsive to CVS's requests, as well as

---

[16] *See, e.g., Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 813 (9th Cir. 2003) (finding, among other things, that a subpoena that seeks documents not "relevant to the facts in issue" was overbroad); *In re Trinh*, No. 2:18-bk-11475-RK, 2022 Bankr. LEXIS 1517, at *6 (Bankr. C.D. Cal. May 31, 2022) (quashing subpoena not relevant to specific proceedings); *Sanchez v. Am. Media, Inc.*, No. CV 20-2924 DMG (PVCx), 2023 U.S. Dist. LEXIS 128266, at *37 (C.D. Cal. May 8, 2023) (quashing subpoenas to the extent they sought information that has no bearing on claims); *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 50 (S.D.N.Y. 1996) (a subpoena that "pursues material with little apparent or likely relevance to the subject matter…runs the greater risk of being found overbraod and unreasonable").

thousands of additional contract amendments, each of which would have to be individually retrieved and manually analyzed, and that it would take approximately 1,000 person-hours to locate and redact the responsive contracts. *Id.* ¶ 9.

In addition to the substantial amount of time required to locate the responsive contracts, many of OptumRx's contracts also include confidentiality obligations that require OptumRx to provide notice, notice and an opportunity to object, or seek approval before producing a client's contracts. *Id.* ¶ 10.  To determine whether such confidentiality obligations exist, OptumRx would need to manually review each responsive contract, and then (a) identify the appropriate individual, on a client-by-client basis, to which written notice could be provided; (b) send a letter to each point of contact providing the appropriate notice or requesting prior approval; (c) brief and prepare client account managers to address follow-up client questions and concerns; and (d) respond to requests for additional information and client concerns. *Id.* OptumRx estimates that it would take in excess of 2,000 person-hours to comply with these obligations prior to production. *Id.* ¶ 11. These burdens are further enhanced by the relevant time period.  Given that many of the contracts are more than fifteen years' old, the notice information in many of those contracts is likely inaccurate.  Many of those agreements have terminated, and many of OptumRx's account managers for those accounts no longer work for OptumRx. *Id.* ¶12.

In light of the above, the burden on OptumRx is substantial.  CVS seeks every single contract OptumRx has with a commercial client over a period of more than seven years, commencing almost fifteen years ago and ending over eight years ago.  In total, OptumRx anticipates that it would require 3,000 hours of work to be able to produce the requested documents, which would divert the assigned personnel from other necessary tasks.  Particularly when weighed against the substantial issues regarding the relevance of the materials sought by CVS, the motion should be denied on this basis as well.

JOINT STIPULATION REGARDING PETITIONER'S MOTION TO COMPEL DOCUMENT PRODUCTION

### 3. OptumRx Does Not Possess Information Responsive to Request No. 6.

As CVS acknowledges, OptumRx has stated that it does not have responsive reconciliation reports or other data containing the information about GER reconciliation payments made by OptumRx relatable to CVS claims data. This portion of CVS's motion is therefore moot.

With regard to summary reports, while OptumRx prepares Discount and Dispensing Fee Performance summary reports for clients, those reports summarize reconciliation across Optum Rx's network of over 68,000 pharmacies and are not specific to any one pharmacy. Hanks Decl. ¶ 7. Certain claims are excluded from the annual reconciliation, for instance, some client contracts exclude usual and customary claims from reconciliation. *Id*. Accordingly, these reports could not be used to determine the impact of any one pharmacy's claims on the generic reconciliation process for the client. *Id*. And, even if these reports contained responsive information, which they do not, OptumRx typically does not retain reports that are now at least eight years' old.[17] In certain instances, client reconciliations are further negotiated with clients and those summary reports do not represent the amounts actually paid to clients, if any. *Id.*

As to the data pertaining to the reconciliation process, OptumRx Finance's claims history database only stores data related to guarantee payments to its clients for three years before it is purged. *Id.* ¶ 6. OptumRx Finance's claim history database thus does not have any data related to guarantee payments made during the relevant time period. *Id.*

### 4. The Communications Sought by CVS are Duplicative and of Minimal Relevance.

When CVS took OptumRx's corporate deposition in February 2019, it identified twelve topics for examination. One of those topics was nearly identical to Request No.

---

[17] Despite the clear irrelevance of these reports, OptumRx will agree to produce any such reports for the relevant time period that it can locate.

12, which is at issue here, and sought: "Your communications with clients regarding Membership Programs."  Montcalm Decl. Ex. 1, at Topic No. 4.  CVS had a full and fair opportunity in 2019 to inquire as to OptumRx's communications with its clients regarding Membership Programs.  *See id.* ¶3.  That it is now apparently unsatisfied with the discovery it obtained on that topic does not justify the cumulative and duplicative request to now have OptumRx conduct custodial email searches covering that identical topic.

Additionally, the communications sought by CVS relate primarily to a time period during which OptumRx held an "infinitesimal" market share of the PBM business, thereby undermining their claimed relevance here to the issue of the knowledge of putative class members of CVS's reporting practices as they pertain to U&C pricing.  By way of illustration, the court in *Sheet Metal* roughly estimated that there would be 40,000 PBM/client contracts to review.  Class Cert. Order at 37.  It is unclear whether that estimate was arrived at using the number of potential putative class members alone, or whether it also considered that TPPs could have multiple contracts.  In any event, OptumRx estimates that it may have to review and produce 2,000 contracts for 1,200 clients.  These numbers further illustrate that OptumRx was a releatively small market participant during the relevant time period.  That OptumRx's communications with its relatively few clients could establish a sufficient base of client knowledge regarding CVS's reporting practices for U&C pricing is, at best, a stretch.  Thus, the potentially marginal relevance of information from OptumRx's clients is far outweighed by, and disproportional to, the burden associated with OptumRx searching for all communications about pharmacy membership programs, as sought by CVS.

1   **5.    Alternatively, Petitioners should be required to pay the costs**

2   **associated with this burdensome contract review.**

3   "A court may, in certain instances, shift the cost of complying with a subpoena

4   from the nonparty to the requesting party." [18] In light of the significant burden

5   producing over 2,000 contracts would impose on OptumRx, cost-shifting in this case is

6   warranted if the Court is inclined to grant Petitioner's request as to the contracts,

7   because those costs will undoubtedly be significant. Indeed, the Ninth Circuit has left

8   no doubt regarding the requirement for cost-shifting under such circumstances. [19]

9

10   Respectfully submitted, on: October 13, 2023

11

12   */s/ Elizabeth A. Mitchell*
     Elizabeth A. Mitchell (SBN 251139)
     UMHOFER, MITCHELL & KING LLP

13   767 S. Alameda St., Suite 270
     Los Angeles, CA 90021

14   Telephone: 213-394-7979
     Facsimile: 213-529-1027

15   elizabeth@umklaw.com

16   William T. Burke*
     Grant A. Geyerman*

17   WILLIAMS & CONNOLLY LLP
     680 Maine Ave, SW

18   Washington, DC 20024
     Telephone: 202-434-5000

19   Facsimile: 202-434-5029
     wburke@wc.com

20   ggeyerman@wc.com
     * forthcoming *pro hac vice*

21

22   *Attorneys for Petitioner CVS Pharmacy, Inc.*

23

24

25

26

27   [18] *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013).

28   [19] *Id.* ("Rule 45(d)(2)(B)(ii) requires the district court to shift a non-party's costs
     of compliance with a subpoena, if those costs are significant.").

*/s/ Jonathan Montcalm*
Jonathan Montcalm (*pro hac vice* forthcoming)
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, New York 10019
Telephone: (212) 415-9347
montcalm.jonathan@dorsey.com

*Attorney for Respondent OptumRx, Inc.*

## **ATTORNEY ATTESTATION**

The other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

*/s/ Elizabeth A. Mitchell*
Elizabeth A. Mitchell (SBN 251139)
UMHOFER, MITCHELL & KING LLP
767 S. Alameda St., Suite 270
Los Angeles, CA 90021
Telephone: 213-394-7979
Facsimile: 213-529-1027
elizabeth@umklaw.com

*Attorneys for Petitioner CVS Pharmacy, Inc.*

JOINT STIPULATION REGARDING PETITIONER'S MOTION TO COMPEL DOCUMENT PRODUCTION